On appellant's petition for reconsideration filed January 31, reconsideration allowed; former decision (210 Or App 532, 152 P3d 287) adhered to April 18, 2007

In the Matter of the Marriage of

Paula K. GARDNER,
*Petitioner-Respondent,*

*and*

Christopher J. GARDNER,
*Respondent-Appellant.*

Benton County Circuit Court
0430342; A131080

157 P3d 320

Thomas J. Peterson for petition.

Before Edmonds, Presiding Judge, and Brewer, Chief Judge, and Wollheim, Judge.

BREWER, C. J.

**BREWER, C. J.**

Husband petitions for reconsideration of this court's decision dated January 17, 2007, in which we affirmed without opinion the trial court's judgment dissolving the parties' marriage. Husband asserts that we did not give due consideration to his argument that the trial court failed to justly and properly divide the parties' property. We allow reconsideration for two reasons: (1) to elucidate the reasons for our earlier decision and (2) to explain why we originally affirmed the trial court's judgment without written opinion. For the following reasons, we adhere to our original decision.

The record in this case is neither lengthy nor complex. The parties were married in 1993, they separated in April 2004, and their marriage was dissolved in 2005. At the time of trial, wife was 48 years old and husband was 47. Wife has two adult children from a previous marriage, but the parties have no joint children. Husband enjoys good health. He is a software development engineer who, despite periods of unemployment during the marriage, earned $567,103 during that period.[1] Although wife otherwise enjoys good health, she has impaired vision, was not employed during most of the marriage, and, by husband's account, earned only $25,000 during that period.

In 1997, after wife's father died, wife's mother gave her $400,000 in the form of a check made out to wife alone. Wife deposited the check into a bank account held in her name alone. Using $371,935 of the proceeds from her mother's gift, wife purchased what became the marital residence. Wife took title to the residence in her name alone. Husband testified that he became aware of the gift "[w]hen the house was being purchased." For purposes of preparing a gift tax return for 1997, on April 24, 1998, wife's mother made handwritten notes indicating that she had made the gift to wife; she did not name husband as a recipient.

---

[1] We take this "earnings" figure from husband's brief. Although it does not affect our analysis of the issues that he raises on appeal, we observe that only $382,103 of that number is earnings or unemployment compensation; the remaining $185,000 is the proceeds of two sales of timber.

Wife's mother, who was 87 years old at the time of trial, moved into the residence with the parties. Wife's mother is diabetic, partially blind, and frail, and wife has provided her with constant care ever since she began residing with the parties.[2] On cross-examination, in response to wife's attorney's inquiry whether wife was the donee of the $400,000 gift, husband answered:

> "She—I think one of the things contingent on both gifts was that [wife] care for her mother, that her mother be able to live in a house where [wife] would take care of her, and so it wasn't a gift in the sense that 'Here's some money. Do what you want with this.' It was tied into 'Help me out. Watch over me. Help me live a little longer.' "

Wife testified that, although her care for her mother was not a "condition" of the gift, from a "moral point of view" she would care for her mother as long as she was physically able to do so. Wife's mother made other gifts during the marriage, totaling approximately $60,000. Both parties benefitted from those gifts.

In 2003, a loan in the amount of $110,000 was taken out against the residence to pay off debts that the parties had incurred while husband was unemployed. When wife applied for the loan, the application stated that title would be held in her name alone. Wife was told that she would have to convey an interest in the residence to husband when she went to the lender's office to sign the loan documents. Both parties signed the loan documents, and wife executed a deed conveying a joint interest in the property to husband at that time. Before the loan closed, the parties never discussed the possibility of husband's name being added to the title to the property.

Both parties performed work on the property during the marriage, and they spent substantial sums to improve it. The trial court found that the property had appreciated $70,816 in value during the marriage.

---

[2] Husband testified that it was "a tribute to [wife's] care that [her mother has] been able to do so well." When asked whether he had played a role in caring for wife's mother, husband testified that, when the parties lived together, he occasionally took sandwiches to wife's mother and called 9-1-1 a couple of times when she needed emergency medical attention.

■     At trial, wife did not seek an award of spousal support. The parties' primary dispute concerned the disposition of the residence. Wife asserted that husband should share only in its appreciation in value during the marriage; husband argued that its full value should be equally divided. The trial court agreed with wife. For reasons that will become apparent, we set out at length from its letter opinion the salient portions of the trial court's thoughtful decision:

"The main focus of this dissolution litigation is in regards to the real property located at 1490 North Albany Road NW, Albany, Oregon. This is real property that was acquired during the marriage and thus is a marital asset. The following factors as found by the Court are important to the Court's decision:

"1.   Petitioner is 47 years old and graduated from high school in 1974. She attended Foot Hill College in Los Altos, California for a couple of semesters and currently spends much of the time caring for her elderly mother who resides with her.

"2.   Respondent is age 45. He attended and graduated from San Jose State where he obtained a Bachelor's of Arts Degree in Mathematics in 1985. During the marriage the Respondent was unemployed from the fall of 1997 until the summer of 1999. During the time he was unemployed he took additional vocational classes at Western Oregon University and Linn-Benton Community College. Respondent found employment in July 1999 and stayed employed until October 2001. The Respondent was again unemployed from November 2001 until October 2003 and received unemployment benefits during that time. Since October 2003 Respondent has worked for temp services on an hourly basis. Respondent is in good health and the Court knows of no reason why the Respondent cannot be employed on a full time basis. He has sufficient education and skills to be competitive in the labor market for a long time to come and to prepare for his retirement.

"3.   Petitioner's mother gifted to Petitioner $400,000.00 on September 25, 1997. The Petitioner had been the sole object of her mother's donative intent regarding these funds.

"4.   * * * The Court finds that the actual gift was the sum of $400,000.00 that was gifted to Petitioner on

September 25, 1997. This money was deposited in the Petitioner's separate checking account.

"5. On October 27, 1997 Petitioner from her separate checking account paid $371,184.00 to purchase the real estate [known as the marital residence]. At the time of the purchase the warranty deed that was recorded listed the Petitioner as the sole grantee.

"6. The parties in March of 2003 found themselves in financial difficulties in part because of the Respondent's lack of employment since November of 2001. They applied for a loan * * *. This loan application indicates that title to the real property in question was to be held in Petitioner's name. Petitioner was required by the loan company to add Respondent's name to the title to the property and only because of that reason did she do so. Respondent's name was added to the title to the property in March of 2003, one year before the parties separated, and only to secure financing for the parties to pay off debts that were incurred largely because of Respondent's employment situation. This resulted in the current mortgage against the property of approximately $108,000.00.

"7. Respondent has contributed labor to the property.

"8. The Court finds that the current fair market value of this real property is $550,000.00 and that there is a mortgage against the property in the amount of $108,000.00.

"The Court finds that based on the facts presented in this case that the presumption of equal contribution has been rebutted and that there are no facts which would warrant a 'just and equitable' distribution of any part of the $371,184.00 gift that Petitioner received from her mother that she contributed to this real property. Although husband contributed labor to this property he is to receive the benefit of that contribution from the division of the appreciation of this property that has accrued during the marriage. The Court calculates the appreciation of the property to be $70,816.00. This sum is arrived at as follows: Current fair market value of property $550,000.00 less gift from Petitioner's mother of $371,184.00 less current balance of the outstanding mortgage of $108,000.00 leaving a balance of $70,816.00. Respondent is a joint obligor on the mortgage against this real property. Petitioner shall refinance this property within eighteen months from the date of this letter to remove Respondent from the obligation of his mortgage

and shall provide proof of that refinancing within 10 days of the date of the refinancing to Respondent.

"Equalizing judgment

"* * * Respondent is entitled to an equalizing judgment against Petitioner in the sum of $35,083.00. Petitioner shall pay Respondent this judgment in full within 45 days of the date the Judgment of Dissolution of Marriage is signed by the Court. If so paid the Judgment will not accrue interest. If the judgment is not paid within 45 days of the date of the signing of the Judgment of Dissolution of Marriage then the judgment shall bear interest at 9% per annum from the date of entry of the Judgment of Dissolution of Marriage."

With that background in mind, we turn to the controlling legal authority. Wife concedes that the gift from her mother is a marital asset because it was acquired during the marriage and that, like any other gift, it was subject to a rebuttable presumption of equal contribution. ORS 107.105(1)(f); *Kunze and Kunze*, 337 Or 122, 133, 92 P3d 100 (2004). The presumption is rebutted by evidence that the asset was acquired free of any contributions from the other spouse. *Id.* at 134.

As we explained in *Olesberg and Olesberg*, 206 Or App 496, 503, 136 P3d 1202 (2006):

"In *Kunze*, the court held that a finding that the wife 'had been the sole object of her aunt's donative intent' overcame the presumption that the husband had contributed equally to the initial acquisition of the inherited asset. 337 Or at 143. Since *Kunze*, we held in *Tsukamaki and Tsukamaki*, 199 Or App 577, 583, 112 P3d 416 (2005), that, when the marital asset is a gift, one spouse may rebut the presumption of equal contribution by evidence that 'the other spouse neither contributed to its acquisition nor was the object of the donative intent.' 199 Or App at 583."

Husband asserts that *Olesberg* supports his position because, in that case, we held that the presumption of equal contribution was not rebutted merely by showing that an inheritance devolved to the donor's child and his siblings in equal shares, in the absence of affirmative evidence that the nonrecipient spouse was not an object of the donor's largesse. 206 Or App

at 503-04. Husband asserts that wife has made no better showing in this case.

But *Olesberg* is distinguishable. In the first place, *Olesberg* involved a 25-year marriage and a corresponding length of relationship between the nonrecipient spouse and the donor. Here, the parties were married for only four years when the gift was made. But, what is more important, not only was her mother's check made payable solely to wife, wife's mother's notes made it clear that she intended to make the gift solely to wife; husband was not named as a donee for the purpose of preparing her mother's 1997 gift tax return. In addition, husband himself testified that the $400,000 gift was contingent on wife's obligation to provide care for her mother. Although wife described her commitment to care for her mother as a moral, not a legal, obligation, the evidence clearly established that the gift was grounded in the premise of ongoing mutual care and support that inheres in the parent-child relationship at its best.

Moreover, wife was her mother's constant caregiver after the residence was acquired and remained so at the time of trial. Although husband asserts that he also provided some assistance to wife's mother, that assertion is overshadowed by his own concession, in his reply brief, that wife was providing "her ailing 87 year old mother constant care and supervision." There was no evidence that husband had a close relationship with wife's mother, that he made any commitment to care for her or that, in fact, he ever provided her with any significant care or support.

In short, the evidence established that wife was the sole object of her mother's donative intent. Accordingly, wife rebutted the presumption that husband equally contributed to her mother's gift. However, even if she had not done so, the same evidence demonstrated that it was just and proper to exclude the initial amount of the gift, albeit not its appreciated value, from the property division. *See Tsukamaki*, 199 Or App at 588 (although the husband rebutted the presumption of equal contribution with regard to asset given by the wife's parents, it was just and proper to award more than half

the subject assets, in part because of likelihood that the wife would use the assets for the benefit of her parents).[3]

The preceding discussion leads us to our second point. This court repeatedly has stated that it will not micromanage trial court decisions that disentangle the economic affairs of divorcing spouses, unless we can meaningfully improve on such decisions. *See, e.g., Thompson and Thompson,* 204 Or App 53, 60, 129 P3d 189 (2006); *Shlitter and Shlitter,* 188 Or App 277, 283, 71 P3d 154 (2003); *Bidwell and Bidwell,* 170 Or App 239, 242, 12 P3d 76 (2000), *adh'd to on recons,* 172 Or App 292, 18 P3d 465, *rev den,* 332 Or 305 (2001).

There are good reasons for that practice, including the fact that a different array of circumstances exists in every dissolution action, making fact-matching especially treacherous. More importantly, a marital dissolution is more than the mere liquidation of an economic partnership; it involves the calibration of multiple socio-economic objectives with respect to which trial courts have a range of reasonable discretion to fashion an equitable outcome. *See* ORS 107.105(1)(f); *Kunze,* 337 Or at 136; *see also Haguewood and Haguewood,* 292 Or 197, 206, 638 P2d 1135 (1981) ("[A] marital dissolution often requires the achievement of certain social as well as financial objectives which may be unique to the parties."). Thus, depending on the circumstances, there often can be more than one overall economic solution that would withstand an appeal from a dissolution judgment.[4]

---

[3] In his petition for reconsideration, husband also relies on our decision in *Uwimana and Rwangano,* 209 Or App 693, 149 P3d 257 (2006). In that case, we held that the trial court had erred in awarding the wife a three-quarters interest in the equity in the parties' marital residence. *Id.* at 697. The trial court had based its decision on the fact that the wife used money from her own separate account for the down payment and the husband used money from a joint account. Although those facts were uncontested, the money from the wife's account was a marital asset, because it was acquired during the marriage. We did not determine whether the wife had rebutted the presumption that the husband had equally contributed to the acquisition to the funds in her account. *Id.* We held that, even if she had rebutted the presumption, the wife's initial contribution was untraceable after it, along with funds that the husband used from the parties' joint account, were commingled into the acquisition of the family home. *Id.*

Here, in striking contrast to the facts in *Uwimana,* the $371,184 that wife used from her separate checking account to purchase what would become the marital residence was traceable to the gift of $400,000 given solely to wife by her mother.

[4] We do not mean to suggest that that is the circumstance in this case.

Although ORS 19.415(3) requires this court to try *de novo* every equitable proceeding, including dissolution actions, we have discretion whether to modify divisions of property in dissolution judgments. *Haguewood*, 292 Or at 201.[5] This jurisprudential approach serves both as an invitation to principled arguments and a statement of self-restraint in favor of stability.

Because divorcing spouses may find it difficult to accept adverse trial court decisions while in the throes of an inherently stressful experience, when those decisions nonetheless are correct, it often is of little benefit to the appellant, and of even less use to the public, the trial bench, and the bar, to publish that confirmation.[6] That is particularly so, where, as here, the trial court's insightful and legally correct disposition of the issues before it should stand as a sufficient answer to the appellant's disappointment.

Reconsideration allowed; former decision adhered to.

---

[5] In *Haguewood*, 292 Or at 201-02, the Supreme Court described its review of discretionary decisions in dissolution actions in this way:

"The policy favoring finality of decrees suggests that we modify discretionary acts rarely, and that has been our practice since 1969 when we became a court of review. We recognize that any review of trial court discretion must be founded on a healthy respect for the wisdom of our modern chancellors in the trial courts who see the people, decide the cases and develop a feel for the best solution in what are often difficult circumstances. On the other hand, judicial discretion is not a license for judges simply to exercise their individual will, for we are judges, not kings. Discretion is a device for reason, not will. Thus, equitable discretion should be exercised in a principled manner, based on experience and learning."

[6] An exception, of course, exists where the case involves a novel legal issue or a problem that has recurring implications for the bench and bar.